UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BILLY JO SPENCER, Mother and
Natural Guardian of DSS,

          Plaintiff,                **No. 08-CV-00430HKS**

    -vs-

CITY OF LOCKPORT


          Defendant.
_____


### DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including entry of final judgment. Dkt. # 10.


### PRELIMINARY STATEMENT

Plaintiff Billy Jo Spencer, mother and natural guardian of DSS, seeks recovery for alleged violations of the infant plaintiff's constitutional rights under 42 U.S.C. §§ 1981, 1983, 1985. Plaintiff also asserts New York state law causes of action for false imprisonment, negligence, invasion of privacy, and civil rights violations under the Constitution of the State of New York.

Currently before the Court is a motion for summary judgment by defendant City of Lockport based on qualified immunity. Dkt. # 16.

1

For the following reasons, summary judgment is granted to defendant and plaintiff's complaint is dismissed in all respects.

## FACTUAL BACKGROUND

The parties do not dispute the basic facts of the case as set forth below.

On January 7, 2008, the infant plaintiff, DSS, had in his possession at Lockport High School a composition notebook entitled "Death Note". Dkt. #16 at Ex. G, p 6, lines 3-7; Dkt. # 18 at Ex. A, p 6, lines 3-7. Within the "Death Note" notebook, DSS had written the names of forty-four students he knew at both Lockport High School and Emmett Belknap Middle School. After the names of each individual student, DSS described how each of the students would die. Several of the students listed in the notebook had asterisks by their names. Dkt. #16 at Ex. F. According to DSS, the asterisks next to certain students' names indicated that those students would suffer harder deaths. Dkt. # 16 at Ex. G, p 9, 11, 16-17.

On the day in question, the Lockport High School's administration became aware of DSS's possession of the "Death Note" notebook through student complaints. DSS was brought to the school's administrative offices where he, at the request of the school Vice Principal, Melissa Niver ("Niver"), turned over the notebook in question. Dkt. #16 at Ex. G, p 31, lines 12-23; Dkt.

#18 at Ex. A, p 31, lines 12-23.  After reviewing the notebook and verifying that said notebook belonged to DSS, Niver contacted the school's Safety Officer, Scott Snaith ("Snaith").  Dkt. # 16 at Ex. G, p 32, lines 5-13; Dkt. #18 at Ex. A, p 32, lines 5-13.

Snaith reviewed the "Death Note" notebook and subsequently attempted to contact Detective Warren Hale ("Hale"), the Lockport City Police Department's juvenile officer.  Snaith was unable to get ahold of Hale, and left Hale a message to contact him.  Dkt. #16 at Ex. I, p 21, lines 1-19; Dkt. #18 at Ex. B, p 21, lines 1-19.  Thereafter, Snaith contacted the Niagara County Department of Mental Health ("Mental Health") and spoke with the director.  The Mental Health director indicated to Snaith that he could refer DSS for a psychological examination at the Niagara Falls Medical Center ("the Center") to determine whether DSS was a serious threat to himself or others.  Dkt. #16 at Ex. I, p 22, lines 1-23, p 23, lines 1-3.  Snaith then contacted Rural Metro Ambulance to have DSS transported to the Center for a psychological evaluation.  Dkt. #18 at Ex. B, p 26, lines 4-14.

Thereafter, Hale responded to Lockport High School.  Hale reviewed a photocopy of the "Death Note" notebook himself.  Hale and Snaith conducted an interview with DSS and engaged in a conversation with DSS's mother, who had been called to the school as a result of the incident.  Dkt. #16 at Ex. J, p 34, lines 20-23. In the interview, DSS indicated that the "Death Note" notebook was

related to a movie he was writing. Dkt. # 18 at Ex. B, p 31, lines 15-17. In the course of the conversation with DSS's mother, she indicated that DSS had an appointment scheduled for that day to meet with Dr. Eugene Domenico, whom DSS had been counseling with for a period of several months prior to the incident. Dkt. #16 at Ex. G, p 61, lines 16-18; Dkt. # 18 at Ex. C, p 61, lines 7-23. She also indicated that she was aware of the "Death Note" notebook and had taken similar notebooks away from her son in the past and thrown them away. Dkt. # 16 at Ex. H, p 56, lines 19-23. She explained that, due to her concerns for her son's well-being, she had, prior to the date of the incident, talked with the school guidance counselor to get her son assistance. Dkt. # 16 at Ex. H, p 37, lines 1-5. She further indicated that she had also been concerned that her son was associating with "Goth" kids, one of whom engaged in cutting herself (and DSS on one occasion) with a razor blade. Dkt. # 16 at Ex. H, p 58, lines 7-22; Dkt. # 18, Ex. C, p 60, lines 5-8. DSS's mother stated that she became concerned for her son's well-being in the Fall of 2008, when his behavior had started to change; at that time, DSS was writing stories and the stories were becoming increasingly violent. Dkt. #16 at Ex. H, p 37, lines 4-11. Based on what he observed and heard that morning, Hale agreed that DSS should be taken to the Center for psychological evaluation. Dkt. #16 at Ex. J, p 72, lines 12-16. Snaith and Hale were both law enforcement officials for the City of

Lockport Police Department with histories of juvenile experience. Dkt. # 16 at Ex. I, p 11, lines 7-23, Ex. J, p 7, lines 8-23, p 14, lines 17-23.

## DISCUSSION AND ANALYSIS

### Summary Judgment Standard

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. See Fed R. Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). Summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party. See NetJets Aviation, Inc. v. LHC Commc'ns. LLC, 537 F.3d 168, 178-79 (2d Cir. 2008). In deciding a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008). The non-moving party cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotation marks omitted).

**Plaintiff's Section 1983 Claim**

Section 1983 imposes civil liability on any party who, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; see also Williams v. N.Y. City Hous. Auth. & Local 237, I.B.T., No. 05 Civ. 2750 (DC), 2007 U.S. Dist. LEXIS 91134, at **12-13 (S.D.N.Y. Nov. 30, 2007), aff'd, 335 Fed. App'x 108 (2d Cir. 2009). To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that (1) defendants acted under "color of state law" (2) to deprive him of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. Pitchell v. Callan, 13 F.3d 545, 547-48 (2d Cir. 1994); see also Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

Plaintiff alleges that the City of Lockport is liable under 42 U.S.C. § 1983 for the acts of its police officers, Snaith and Hale, who allegedly subjected DSS to false arrest and unlawful imprisonment in violation of his rights under the Fourth and Fourteenth Amendments.[1] Although the defendant does not move for summary judgment based on the ground that it cannot be held

---

[1]     In the complaint, the plaintiff does not specify which of DSS's constitutional rights were allegedly violated. Due to the nature of the case, the Court will construe the plaintiff's § 1983 claim as an alleged violation of DSS's rights under the Fourth and Fourteenth Amendments.

vicariously liable under <u>Monell</u>[2] for the actions of its employees under § 1983, a motion for summary judgment authorizes the district court to search the record, and to grant summary judgment to the party entitled thereto.  <u>See</u> <u>Coach Leatherware Co. v. Ann Taylor, Inc.</u>, 933 F.2d 162, 167 (2d Cir. 1991);  <u>Project Release v. Prevost</u>, 722 F.2d 960, 969 (2d Cir. 1983).  Accordingly, the Court finds that defendant is entitled to summary judgment on the ground that there is no § 1983 <u>Monell</u> liability under the facts and circumstances of this case.

A municipality may not be held liable under § 1983 on the basis of *respondeat superior*.  <u>Monell</u>, 436 U.S. at 690-91.  Rather, a plaintiff must establish both a violation of his or her constitutional rights and that the violation was caused by a municipal policy or custom; that is, that the policy or custom was the actual "moving force" behind the alleged wrongs.  <u>See</u> <u>id.</u>; <u>Bd. of the County Comm'rs v. Brown</u>, 520 U.S. 397, 400 (1997).  A municipality cannot be held liable where there has been no underlying constitutional violation.  <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986); <u>see</u> <u>also</u> <u>Ricciuti v. N.Y.C. Transit Authority</u>, 124 F.3d 123, 132 (2d cir. 1997) (section 1983 <u>Monell</u> liability "cannot be made out against a supervisory body without a finding of a constitutional violation by the persons supervised.") (citing <u>Heller</u>, 475 U.S. at 799).  As discussed

---

[2]     <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 690-91 (1978).

below, plaintiff has suffered no constitutional injury upon which he can hold the City of Lockport liable, nor can he demonstrate that, even if he did suffer a constitutional injury, that said injury was caused by a municipal policy or custom of the City of Lockport.

It is well-established that "involuntary civil commitment is a 'massive curtailment of liberty' and it therefore cannot permissibly be accomplished without due process of law." Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995) (quoting Vitek v. Jones, 445 U.S. 480, 491 (1980)). Accordingly, the Fourth Amendment requires an official to have probable cause to believe that a person is dangerous to himself or others before he can seize and detain such person for a psychiatric evaluation. See Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993) ("The Crisis Team took [plaintiff] to the hospital against his will, and he was involuntarily confined there pursuant to state law. This infringement of his liberty was tantamount to the infringement of being arrested. That his seizure occurred in the civil context does not render the Fourth Amendment inapplicable.") (citations omitted).

> If a dangerous mental condition is analogized to the role of criminal activity in traditional Fourth Amendment analysis, a showing of probable cause in the mental health seizure context requires only a "probability or substantial chance" of dangerous behavior, not an actual showing of such behavior. See Illinois v. Gates, 462 U.S. 213, 245 n.13 (1983). Just as actual innocence will not

8

> render an arrest invalid if it is based on
> then-existing probable cause that criminal
> activity is occurring, <u>see</u> <u>Criss v. City of
> Kent</u>, 867 F.2d 259, 262 (6th Cir. 1988), a
> mental health seizure can rest upon probable
> cause even when the person seized does not
> actually suffer from a dangerous mental
> condition. Because "probable cause is a fluid
> concept--turning on the assessment of
> probabilities in particular factual contexts,"
> <u>Gates</u>, 462 U.S. at 232, courts evaluate the
> existence of probable cause from the
> perspective of a reasonable and objective
> person in the position of the seizing
> official. <u>See</u> <u>Criss</u>, 867 F.2d at 262-63.

<u>Monday v. Oullette</u>, 118 F.3d 1099, 1102 (6th Cir. 1997) (citations omitted).

Under New York law, the director of community services has the power to direct the removal of any person, within his or her jurisdiction, to a hospital approved by the Commissioner to accept emergency admissions for immediate observation, care and treatment if:

> a licensed psychologist, registered
> professional nurse or certified social worker
> currently responsible for providing treatment
> services to the person, a licensed physician,
> health officer, peace officer or police
> officer reports to him that such person has a
> mental illness for which immediate care and
> treatment in a hospital is appropriate and
> which is likely to result in serious harm to
> himself or herself or others.

New York Mental Health Law ("M.H.L.") § 9.45. The phrase "likely to result in serious harm" is statutorily defined to mean: "(a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other

conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." M.H.L. § 9.01; see also M.H.L. § 9.39(a).

Here, the City of Lockport police officers Snaith and Hale had probable cause and reasonable grounds for believing that the infant plaintiff was a danger to himself or others, specifically those students listed in the "Death Note" notebook, and therefore subject to seizure under M.H.L. § 9.45. Snaith, who was a law enforcement official with a history of juvenile experience, based his determination that DSS should be taken for psychological evaluation on his personal review of the "Death Note" notebook. This notebook, entitled "Death Note", contained the names of real -- not fictitious -- students, and explained, in detail, how each of the students would die. By making this determination and arranging for DSS's transport to a hospital -- where there were trained personnel who could be expected to understand plaintiff's needs and respond with appropriate care -- Snaith averted the threat of any possible harm that may have resulted to those listed in the "Death Note" notebook and also allowed for DSS to be placed in a safe environment until the appropriate course of conduct became clear. In addition, Detective Hale, also a trained law enforcement official with a history of juvenile experience, reviewed the "Death Note" notebook and conducted an interview with DSS and engaged in

a conversation with DSS's mother. After doing so, he agreed with Snaith that DSS should be taken to the hospital for psychological evaluation.

In any event, even assuming arguendo that DSS's constitutional rights were violated, the plaintiff has not provided any evidence, nor is this Court able to discern any evidence based on its independent review of the record, in support of the plaintiff's allegation that Snaith and/or Hale -- or any other municipal employee for that matter -- acted pursuant to a municipal policy or custom that was the "moving force" behind the alleged wrongs. Monell, 436 U.S. at 690-91. Accordingly, summary judgment is granted to defendant on plaintiff's section 1983 claim against the City of Lockport.

**Plaintiff's Section 1981 Claim**

To state a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.). See Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1087 (2d Cir. 1993). None of the facts in this case give rise to a claim under § 1981. Accordingly, the claim is dismissed.

11

**Plaintiff's Section 1985 Claim**

In order to recover under § 1985, a plaintiff must establish: (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. See Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). "The conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" Id. (quoting Mian v. Donaldson, Lufkin & Jenrette Secs. Corp., 7 F.3d 1085, 1088 (2d Cir. 1993)). The plaintiff's complaint is devoid of any allegations of conspiracy or discriminatory intent. Accordingly, the plaintiff's § 1985 claim is dismissed.


**Plaintiff's State Law Claims**

Plaintiff's state law claims are dismissed for jurisdictional reasons.

"The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). With the dismissal of plaintiff's federal claims, there remains no independent jurisdictional basis for the state law claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S.

343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"); United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims and dismisses them.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is granted. Dkt. #16. The Clerk of the Court is directed to enter judgment in favor of the defendant.

**SO ORDERED.**

DATED:   Buffalo, New York
         November 19, 2010

                                s/ H. Kenneth Schroeder, Jr.
                                HON. H. KENNETH SCHROEDER, JR.
                                United States Magistrate Judge